UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION


UNITED STATES OF AMERICA

v.

Case No.   5:06-cr-4-Oc-10GRJ

WILLIAM C. MILLER

_____

### REPORT AND RECOMMENDATION[1]

Pending before the Court are: (1) Defendant William C. Miller's Motion To Suppress Evidence (Warrantless Search-Staleness Of Information In Support of Probable Cause) (Doc. 22), (2) Defendant William C. Miller's Motion To Suppress Evidence (Warrantless Search-Consent To Search Invalid As Involuntary) (Doc. 23), and (3) Defendant William C. Miller's Motion To Suppress Evidence (Warrantless Search-Consent Invalid Due To Scope Of Same Being Exceeded). (Doc. 24.) The United States filed a Consolidated Response to all three motions to suppress (Doc. 34) and the Court conducted an evidentiary hearing on May 10, 2006. At the Court's invitation the parties filed supplemental briefs. (Docs. 45 &  49.)

After supplemental briefing, the Defendant requested that the Court reopen the hearing for the limited purpose of exploring the circumstances surrounding the delivery of the original of the "Consent To Search Form" (a copy of which was introduced into

_____

[1] Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

evidence at the May 10, hearing ) to the evidence room at the Ocala Police Department

by the police officer, who conducted the search in this case. Pursuant to Defendant's

request the Court conducted a further evidentiary hearing on June 26, 2006 and,

accordingly, the matter is ripe for review. For the reasons discussed below Defendant's

Motions To Suppress Evidence are due to be **DENIED**

## I.  Introduction

The Defendant is charged in this case in a two count indictment with distribution

of child pornography and possession of child pornography in violation of 18 U.S.C. §§

2252A(a)(2)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(2) respectively.

The local investigation in this case began on or about June 19, 2005, when two

officers from the Ocala Police Department ("OPD") went to the Defendant's residence at

6550 S.W. 12th Ct., Ocala, Florida to investigate information received from the North

Florida Internet Crimes Against Children Task Force that child pornography had been

found on a Cox Communications internet account registered to the Defendant. The two

OPD officers, who conducted the investigation and subsequent search at Defendant's

residence, were Cpl. Charles Eades and Detective Christine Graham. According to the

United States, Cpl. Eades and Detective Graham conducted a consensual search at

Defendant's residence and as a result of the search a computer and other peripherals

were seized, which after later forensic examination revealed thousands of images of

child pornography, including videos.

Defendant challenges the search on Fourth Amendment grounds and raises

three arguments in support of his request to suppress the child pornography obtained

from the search. First - and the primary focus of Defendant's motion - is Defendant's argument that the search was involuntary even though he executed a consent to search form. Secondly - as an analogue to Defendant's challenge to the voluntariness of his consent - Defendant contends that the search exceeded the scope of any implied or written consent by removing hard drives - in addition to the computer - from Defendant's residence and then conducting a subsequent forensic analysis without obtaining a warrant. Lastly, Defendant argues that the information, which triggered the search of Defendant's residence, was stale and therefore insufficient to support probable cause for the search.

## II. Evidence And Testimony

The United States called Cpl. Eades, a police officer with the OPD, as its primary witness. The Defendant testified on his own behalf and also submitted into evidence the deposition transcript of the testimony of Detective Graham,[2] taken in a state prosecution of the Defendant, which was later dismissed in lieu of federal prosecution.  Cpl. Eades, a police officer with seventeen years of experience, began his career in 1988 with the South Miami Police Department and worked there until 1995. During his tenure with the South Miami Police Department Cpl. Eades worked uniform patrol, undercover narcotics and was a member of the tactical squad. In 1995 he relocated to Ocala and began working with OPD on uniform patrol. While with the OPD Cpl. Eades has worked as a school resource officer and has worked with the Internet Crimes Against Children Task Force.  The Internet Crimes Against Children Task Force was formed after receipt of a

---

[2] Defendant's Ex. "2."

grant from the Florida Department of Law Enforcement. During the last eighteen months the Task Force has been working in an undercover capacity concerning internet file trading as well as solicitation of minors for sexual acts over the internet and through chat rooms. Cpl. Eades has received several training courses through the FDLE and has participated with other agencies in child pornography investigations. During the course of his involvement in child pornography investigations with the Task Force Cpl. Eades has seized computers and has interviewed suspects in child pornography investigations.

On July 19, 2005, Cpl. Eades was assigned responsibility for conducting a follow-up investigation for the Gainesville Police Department, which is the headquarters for the Internet Crimes Against Children Task Force. Headquarters had received information concerning the trading of child pornography from a computer located in Ocala and the information was forwarded to Cpl. Eades for investigation. The information provided by the Task Force to Cpl. Eades, was developed in March 2005, four months before the search was conducted at Defendant's residence.[3] Other than the information developed by the Task Force in March 2005 there was no other information developed from that date to July 19, 2005, the date of the search at Defendant's residence.

As part of this investigation, Cpl. Eades, dressed in his duty uniform, and Detective Graham, dressed in plain clothes, went to a residence located at 6550 S.W. 12th Court in their unmarked Crown Victoria police vehicle to make contact with the homeowner, William C. Miller, concerning the trading of child pornography. This

---

[3] The information was originally developed by an Officer Nixon from the Internet Crimes Task Force in Gainesville, who had made a peer-to-peer contact with the Defendant's computer while it was on.

4

address was obtained after law enforcement identified the owner of the computer involved in this case as the Defendant, and then through a search of property records, confirmed this address in Ocala as the home of the Defendant.

According to Cpl. Eades, when he arrived at the residence he either knocked on the door or rang the door bell. The Defendant answered the door and was told by Cpl. Eades that he was conducting an investigation concerning child pornography. Cpl. Eades testified that he asked the Defendant whether he and Detective Graham could "come inside and talk about it" and Defendant responded "come on in." There was no effort on the part of Cpl. Eades to push his way into the residence.

Upon entering the residence, Cpl. Eades and Detective Graham accompanied the Defendant to the living room where they told the Defendant they were there investigating child pornography that was being traded by his computer. The Defendant told the officers about his basic computer set-up, which consisted of a "home computer" and a "business computer." Cpl. Eades asked the Defendant where the computers were located and the Defendant took the officers to a back study or den to show them the computers. In the back den there were two computer set-ups. One computer set-up was on the right side of the room and the other was on the left side of the room. According to Cpl. Eades, the Defendant advised him that the pornography was on the computer on the left-hand side of the room. The Defendant explained to Cpl. Eades that he had a filtering system on the set-up. The Defendant explained that he would download pornography into the main computer system and the information he wanted to retain

would be sent to the permanent files in the attached hard drive.[4] The Defendant inquired as to whether the officers needed to take both computers or just the one with the pornography on it. Cpl. Eades told the Defendant that they could leave the "work computer" so he could continue to work and that they would only have to take the computer that had the child pornography on it. The officers did not seize the business computer but only took the other personal computer and attached hard drive.

According to Cpl. Eades, while they were in the back den, he presented the Defendant with a form entitled "Ocala Police Department Consent And Release" ("Consent To Search Form"), which he read aloud to the Defendant. Cpl. Eades then crossed out the references to "vehicles" on the Consent To Search Form, added the word "computer" and then the Defendant signed the form. Notably, the Consent To Search Form expressly advises the signatory "I understand my constitutional right to refuse a search of said premise without a search warrant. It is my intention to fully and completely waive such right by this consent."

Although the Defendant signed the Consent To Search Form, he was extremely concerned about his neighbors finding out what was going on. Cpl. Eades testified that he assured the Defendant the neighbors would not be consulted and pointed out to the Defendant that the officers were in an unmarked police vehicle and would try not to attract the attention of any neighbors. Cpl. Eades testified that he never told the Defendant that if the Defendant did not sign the Consent To Search Form, Cpl, Eades would get a search warrant. During the entire time in the Defendant's residence the

---

[4] The attached hard drive was a separate "box" attached to the computer and is referred to as a "Maxtor" unit.

officers never raised their voices, never displayed a weapon and never pressured the Defendant in any way to consent to the search

Before taking the computer Cpl. Eades explained to the Defendant that the method they used to examine the computer consisted of "taking a snapshot" of the hard drive, which is then examined in a laboratory setting so that none of the files on the hard drive are lost. Cpl. Eades advised the Defendant that the examination would take place by forensic experts in Gainesville. The Defendant never discussed with the officers or told them to limit the forensic examination of the computer in any way or manner. Indeed, according to Cpl. Eades, the Defendant was cooperative at all times. The officers were at the residence for about twenty minutes, which was long enough for the Defendant to assist the officers with "unhooking" the computer and loading the computer into the unmarked police vehicle.

The officers took a computer tower and a detached hard drive and then loaded them into the trunk of Detective Graham's unmarked police vehicle and took them to the property room at the OPD headquarters. The next day Cpl. Eades picked up the computer tower and detached hard drive from OPD and took them to the Gainesville Police Department for the forensic examination. The forensic examination uncovered child pornography on the hard drive.

At no point in time did Cpl. Eades attempt to obtain either a state or federal warrant to search the premises. And, according to Cpl. Eades, if the Defendant had refused to execute the Consent To Search Form, the officers would have left Defendant's residence unsecured because Cpl. Eades did not believe he had enough at that point to obtain a warrant and instead would have contacted Officer Nixon to follow

7

up for further action.

The Defendant testified at the hearing on behalf of the defense. The Defendant is 41 years old and most recently has lived in Florida for approximately two years. Prior to moving to Ocala he lived in Washington, D.C.. The Defendant holds a bachelor's degree in French, a master's degree in philosophy and was in a doctoral program in French and romance philology for eight years, although he never completed his Ph.D. According to the Defendant, he has a very basic working knowledge of computers, although he is very conversant with the use of word processing programs, primarily from his many years in post graduate school.

Defendant has been living at the current residence since June 1, 2004. The Defendant lives alone and at the time of the search he was living with three dogs, one of which belonged to the Defendant and the other two belonged to his parents. The residence is located in a neighborhood known as "Summit III," which is a gated community of approximately twenty houses, ranging in size from three acre parcels to as little as one acre parcels. The Defendant's residence is approximately one and a half acres.

The Defendant testified that at the time of the search he kept all of his computers in a third bedroom, which he had converted into a study or den. The Defendant's computers consisted of a Macintosh laptop computer, one Dell tower computer and another fairly old Macintosh tower computer. In addition the Defendant had an external drive, known as a "Maxtor," that was intended to be part of the Macintosh laptop for business purposes. At the time of the search the Defendant was intending to set up an antiques business. According to the Defendant, he used the "Maxtor" for a variety of

purposes including such things as storing inventory sheets for his fledgling antiques business. Defendant's parents purchased the Maxtor for the Defendant when he relocated to Ocala to be used by Defendant to store pictures and videos of his antiques inventory so that when he set up a Web site for his antiques business he would have the necessary pictures. However, the Defendant testified that he never got around to using the Maxtor for this purpose and instead used it to store both business and personal items that were too voluminous to store on the Dell computer, which did not have a lot of memory.

Defendant testified that on the day of the search he was alerted that law enforcement was at his residence when his dogs barked and not by the door bell or a knock on the door. The Defendant looked out the window and noticed a police officer (Cpl. Eades) in the area on the side of his house where the cable box is located and a blond woman standing behind him. The Defendant then went outside through the garage to determine why the individuals were standing outside of his home. By the time the Defendant had gone outside the officers had proceeded to the front of the residence, which is where the Defendant first confronted the officers.

Defendant testified that he asked the officers how he could help them and was told by Cpl. Eades "We can't talk out here; we have to go inside." The Defendant testified that he complied with the request to speak inside the residence. The Defendant, followed by Cpl. Eades and Detective Graham, went around through the garage and entered the family room of the residence. Once inside the residence the officers identified themselves to the Defendant. Cpl. Eades explained to the Defendant that the reason the officers were there was because they had downloaded child

pornography from the Defendant's computer and that they needed to make sure that "this didn't involve anyone who was in the neighborhood or local," which Defendant interpreted to mean children in the neighborhood. Defendant became very concerned about the potential reaction of his neighbors and asked the officers whether the officers were going to talk to his neighbors.  Defendant testified that in response to his concern about involving his neighbors, the officers responded that "We've got to take a look and see what's on there, on the computer; and if there are things, then we'll have to speak with the neighbors."  The Defendant told the officers that recently he had been doing a lot of "peer-to-peer downloading of basically all types of pornography" and he did not exactly know what was on the computer. While in the living room Cpl. Eades discussed with the Defendant that the officers would need to take the computers and it would take several weeks to analyze the computers.

After discussing these issues in the living room the Defendant took Cpl. Eades into the den where the computers were located. According to the Defendant, he explained to Cpl. Eades that the Maxtor was used to store all kinds of information, including business and personal information, from the Dell tower and from the Macintosh laptop.

Although the Defendant admitted signing a form at his residence he testified that it was not similar to Government's Exhibit "1", which was a copy of the Consent To Search Form introduced into evidence at the hearing on May 10, 2006. While the Defendant testified that the form he was shown at the hearing did not look similar to the one he signed, the Defendant, nonetheless, admitted that the signature on the copy of the Consent To Search Form resembles his signature. And, most notably, the

10

Defendant never denied at the May 10 hearing that the signature on the copy of the

Consent To Search Form[5] was his signature. Further, at the supplemental hearing on

June 26, 2006 the Government produced the original of the Consent To Search Form,

and despite Cpl. Eades' testimony that the Defendant signed the original of the Consent

To Search Form in Cpl. Eades' presence, the Defendant did not present any testimony

or other evidence challenging the authenticity of his signature on the original. Lastly,

Defendant testified that he was never read the contents of a form by Cpl. Eades.

The Defendant did testify that when he was presented with whatever form he

signed, he allegedly asked Cpl. Eades what would happen if he did not sign the form.

According to Defendant, Cpl. Eades told him that one of the officers would have to stay

there and then the other officer would get a search warrant and come back with

"marked cars with sirens and lights, and everybody in the neighborhood is going to

know ... what's going on." The deposition testimony of Detective Graham corroborates

Defendant's testimony as to whether Defendant was told officers would get a search

warrant if the Defendant did not sign the consent. Detective Graham testified that while

the Defendant was signing the Consent To Search Form he asked what would happen if

he did not sign the form and he was told by Cpl. Eades that they would get a search

warrant. Cpl. Eades denies having advised Defendant of this.

The Defendant further testified that he asked the officers whether he could

consult with a lawyer and was told by both officers "We don't know anything about that."

The officers did not say anything else to the Defendant with regard to whether he could

---

[5] Government Ex. "1."

consult with a lawyer and there was no evidence presented suggesting that the officers did anything to prevent the Defendant from contacting a lawyer or any evidence that the officers provided the Defendant with any advice designed to persuade the Defendant from contacting a lawyer. Without any further discussion with the officers the Defendant admitted that he reviewed the options in his mind and then signed a form. Even though the Defendant elected to sign a form, he testified that he did not understand that by signing a form he was consenting to a search of his residence without a warrant. The Defendant did admit, however, that he assumed when the officers took the computer that they were going to open them and examine the files.

After the Defendant signed the "form" Cpl. Eades proceeded to disconnect the computer and asked whether the Maxtor was a modem. The Defendant advised Cpl. Eades that the device was the Maxtor external storage device the Defendant previously had discussed with Cpl. Eades. Contrary to the testimony of Cpl. Eades, the Defendant denied assisting Cpl. Eades with disconnecting the computer and Maxtor. According to the Defendant, the officers removed the Dell tower computer, the Maxtor external hard drive and the cable for hooking the Defendant's I-Pod to the Dell computer.

During the course of the hearing Cpl. Eades testified that the original of the Consent To Search Form was at OPD headquarters. Subsequent to the hearing, counsel for Defendant discovered that the original of the Consent To Search Form was not maintained in the property room at OPD headquarters and only had been deposited there by Cpl. Eades after counsel for Defendant had requested to view the original.

At the supplemental hearing held on June 26, 2006 Cpl. Eades explained that the

original of the Consent To Search Form[6] was maintained in the case file, which indeed

was located at OPD headquarters and that it was not the usual practice to log these

types of forms into the property room. Cpl. Eades explained that he did so in this case

only after being told that counsel for Defendant wanted to view the original. Because

Cpl. Eades was going on vacation and could not leave his investigation file or the

document by itself, he logged the form into the property room so that counsel for

Defendant could inspect the document at any time without any further involvement by

Cpl. Eades. Cpl. Eades identified the original of the Consent To Search Form at the

supplemental hearing and testified that the Defendant executed the document in the

presence of Cpl. Eades prior to the seizure of the computers. There was no further

evidence offered by the Defendant challenging the authenticity of his signature on the

original of the Consent To Search Form or challenging that the original of the Consent

To Search Form was executed by the Defendant.

### III.  ANALYSIS OF ISSUES

### A.  Voluntary Nature of Defendant's Consent To Search

Defendant challenges the search of his residence and the seizure of his

computers on the grounds that his consent to search was not made knowingly and

voluntarily but rather was merely his acquiescence to the apparent authority of law

enforcement. Additionally, the Defendant contends that even if there was a consent to

enter his residence there was no further consent to search his hard drive for images of

child pornography. As discussed below, the Court concludes that the weight of the

---

[6] Government Ex. "2."

evidence establishes that the Defendant not only voluntarily consented to law enforcement entering his residence but that he voluntarily consented to the removal of his computers and the forensic examination of the contents of the hard drive.

One of the exceptions to the Fourth Amendment requirement that law enforcement obtain a search warrant before searching a private residence is where the resident voluntarily consents to the search.[7] For the consent to be sufficient to overcome Fourth Amendment scrutiny the consent must have been given freely and voluntarily and not merely as an acquiescence to law enforcement authority.[8] The determination of voluntariness must be made by an examination of the totality of the circumstances, taking into account factors such as: the person's youth, the person's education, the existence of advice as to the nature of the constitutional right involved, the length of the detention preceding the request to consent, the nature of the prior questioning, and whether any physical threats were made.[9]

The evidence was not in conflict with regard to most of the material events and the circumstances concerning the search of Defendant's computers. The Defendant admittedly is a highly educated sophisticated individual who has both the intelligence and ability to fully understand the reason why the officers were at his residence and the reason the officers wanted to take his computer and analyze the hard drive. The testimony from Cpl. Eades and the Defendant was consistent with regard to the

---

[7] Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

[8] Bumper v. North Carolina, 391 U.S. 543, 548 (1968).

[9] Schneckloth v. Bustamante, 412 U.S. 218, 226 (1973).

14

demeanor and appearance of the officers when they arrived at the residence and during the discussions that took place inside the residence. The testimony was consistent that the Defendant was extremely cooperative and that neither Cpl. Eades nor Detective Graham raised their voices, displayed weapons or used any type of physical force or coercion to get the Defendant to cooperate. Understandably, the Defendant was extremely concerned that his neighbors would find out that he was being investigated for involvement with the possession and/or distribution of child pornography. While this concern very well may have motivated the Defendant's decisions on July 19, 2005 the Defendant's desire to avoid disclosure to his neighbors about the investigation is largely irrelevant to the issue of whether the consent he gave to law enforcement was given knowingly and voluntarily.

Turning first to the initial entry by law enforcement into Defendant's residence there was no evidence presented that Defendant told the officers he did not consent to their entry. Indeed, the evidence established that the officers were invited into the residence, albeit at their request. While Cpl. Eades testified that he knocked on the door or rang the doorbell - and in contrast the Defendant testified that he was alerted that the officers were at his house when his dogs barked - the fact remains that the Defendant opened the door to his garage and without protest the officers entered his family room to talk with him. There was no testimony that after the officers initially entered the residence Defendant asked them to leave or told them that they could not enter his residence.

Once the officers entered the residence with the consent of the Defendant, the evidence established that the officers identified themselves and expressly advised the

15

Defendant that the officers were there investigating whether child pornography had been downloaded to the Defendant's computer. The Defendant advised the officers that he had computers in the den that included both personal and business information. Notably, the Defendant admitted to the officers that he had used peer-to-peer software to engage in downloading of all types of information including pornography. Cpl. Eades explained to the Defendant the procedures that would be used to search the computers. Defendant was told that the computers would be taken, a mirror image would be made and then a forensic analysis would be conducted of the imaged hard drive so that none of the files would be lost. The Defendant was made aware that this process typically takes several weeks.

While the Defendant did not admit that he knew there was child pornography on his computer he specifically told Cpl. Eades how his computer set-up operated and that he stored downloaded files on the external hard drive, not on the laptop which was used for "work." The Defendant further voluntarily took Cpl. Eades into the den and showed the computer set-up to the officers.

While the Defendant and the officers were in the den - and before the computers were taken - the Defendant executed a consent to search form. Although some of the testimony between the Defendant and Cpl. Eades was in conflict as to the events which transpired incident to the execution of the Consent To Search Form the Court concludes that the evidence clearly establishes that the Defendant knowingly and voluntarily executed the Consent To Search Form.

First, with regard to the threshold issue of whether the Defendant executed the Consent To Search Form there is no question that the Defendant executed the form at

his residence before the computers were seized. Cpl. Eades expressly testified that the Defendant executed the Consent To Search Form in his presence. The Defendant himself admitted that the signature on the copy of the Consent To Search Form resembles his signature. And while not directly admitting that he signed the form the Defendant admitted that he signed some type of form incident to the seizure of his computer. Notably, the Defendant never denied under oath that he had signed the Consent To Search Form but only that the copy of the form he was shown looked different from the form he remembered signing.

With regard to whether the contents of the Consent To Search Form were read aloud to the Defendant, Cpl. Eades testified that he did and the Defendant testified that Cpl. Eades did not. The Court does not need to resolve this dispute because the Consent To Search Form is drafted in plain easy to understand English and clearly advises the signatory that the form is being executed voluntarily, that the signatory understands his constitutional right to refuse a search without a search warrant - and most importantly - that the signatory is consenting to the search and waiving his right to insist upon law enforcement obtaining a search warrant. The Defendant is highly educated having attended college and graduate school for approximately twelve years and certainly is of more than sufficient intelligence and sophistication to understand the clear and unmistakable import of these words in the Consent To Search Form.

Indeed, Defendant's own testimony at the hearing undercuts Defendant's argument that he did not understand what he was signing. The Defendant testified that when he was presented with the form and asked to sign it he "stood over the document thinking, thinking, reeling through my mind what my best ... legal option was in this

17

situation, having exhausted three -- the three options I came up with during the time that they were there -- and eventually ... I don't see that I have any other option but to allow [law enforcement] to take the computer." Defendant then reluctantly admitted that he "glanced at it [the form]" but at the time he was thinking about whether to sign it he "had a pregnant pause probably of about five minutes standing over it racking through my brain whether or not there was another option ... " As this testimony highlights the Defendant took more than five minutes to consider and analyze whether he should sign the Consent To Search Form and considered at least three options. The fact of the matter is that the Consent To Search Form is a one page document that anyone with an average level of intelligence could read and understand in less than one minute. Defendant's suggestion that while he stood over the Consent To Search Form for five minutes thinking of his options he did not read the form or even ask one question as to its meaning defies logic and is simply not credible. Accordingly, the Court concludes that the Defendant indeed executed the Consent To Search Form and understood that by executing the Consent To Search Form the officers were going to remove his computer and have it analyzed to determine whether it contained images of child pornography.

Moreover, although the evidence was disputed as to whether Cpl. Eades told the Defendant that he would get a search warrant if the Defendant did not sign the Consent To Search Form, the Court does not need to resolve this evidence because even if Cpl. Eades told the Defendant that he would get a search warrant if the Defendant did not sign the consent, this statement does not make the consent involuntary. The Defendant testified that Cpl. Eades told him the officers would get a search warrant and come back

with marked police vehicles if the Defendant did not sign the Consent To Search Form. The deposition testimony of Detective Graham partially supports the Defendant's version. Detective Graham testified at deposition that when the Defendant was signing the consent he asked "What would happen if [he] did not sign it" and was told by Cpl. Eades "We'll we're going to have to get a search warrant."[10] A number of courts have held that the mere fact a law enforcement officer advises a defendant that he would attempt to get a search warrant if the defendant did not sign a consent, does not render the defendant's subsequent consent involuntary.[11] Accordingly, even if Cpl. Eades - in response to Defendant's inquiry - had told the Defendant he would get a search warrant if the Defendant did not sign consent, this statement does not render the Defendant's oral and written consent involuntary.

Accordingly, for these reasons, the Court concludes that the Defendant's oral and written consent to the search of his residence and the computer was given knowingly and voluntarily and, therefore, did not violate the Fourth Amendment.

**B.  The Search of Defendant's Computer Was Within The Scope Of The Consent**

As a subsidiary argument to Defendant's challenge to the voluntary nature of his consent to search, the Defendant argues that the removal of the computers and subsequent forensic analysis of the contents of the hard drive was invalid because law

---

[10] Defendant's Ex. "2". p 11, lines 9-16.

[11] *See, e.g.* United States v. Boukater, 409 F.2d 537, 538 (5th Cir. 1969); United States v. Garcia, 890 F.2d 355, 361 (11th Cir. 1989)(consent voluntary even where officers made statements that they would not accept defendant's conditional consent to search and, if he refused to consent to a full search, they would attempt to obtain a search warrant); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989)(consent held voluntary where officers asked for consent to search yard and told defendant that if he refused, they would come back and "dig the place up.").

enforcement exceeded the scope of the consent given by the Defendant.

The standard for measuring the scope of a defendant's consent to a search under the Fourth Amendment is an "objective reasonableness" standard.[12] Under this standard the Court must determine "[w]hat would the typical person have understood by the exchange between the officers and the suspect?"[13]

The Court concludes that the evidence clearly and convincingly establishes that not only was it objectively reasonable for the officers to conclude that the Defendant had consented to the removal of the computer and attached hard drive for forensic analysis but that the Defendant explicitly understood and consented to the removal of the computer and search of the files.

In conducting a reasonableness inquiry of the scope of a search, the court must consider what the parties knew at the time to be the object of the search.[14] There was little question that the sole object for the officers coming to the Defendant's residence and requesting to search his computer was to determine whether the computer contained images of child pornography. This clear understanding of the parties is highlighted by the exchange between the Defendant and Cpl. Eades before the Consent To Search Form was even executed and while the parties were still in the living room. Cpl. Eades testified that he explained to the Defendant that the reason the officers were investigating the Defendant was because of information obtained linking Defendant's

---

[12] _Florida v. Jimeno_, 500 U.S. 248, 251 (1991).

[13] _Id._

[14] _Id._ at 303.

computer to the downloading of child pornography. The Defendant confirmed that he was advised of this information early on in his discussions with Cpl. Eades.  Moreover, before the Defendant and Cpl. Eades had moved to the den where the computers were located the Defendant had advised Cpl. Eades that he had been doing a lot of peer-to-peer downloading of all types of pornography. Notably, the Defendant testified that before he and Cpl. Eades went into the den where the computers were located  "it was clear in my mind that they were not going to be leaving if they weren't leaving with my computer."

According to Cpl. Eades, after the Defendant described the basic set-up of the computers, Cpl. Eades explained to the Defendant the process of how law enforcement would search for images on the computer. Cpl. Eades explained that law enforcement would take the computer and then in the lab a "snapshot" or mirror image of the hard drive would be made and that image would be analyzed so that none of the files would get lost. Defendant was expressly told that this process typically takes about two weeks to complete. In their discussions the Defendant and Cpl. Eades further refined the search to include only the computer and storage device used to download and store files from the internet and that law enforcement would not take the computer that the Defendant advised was used only for business purposes.

Once the parties had gone into the den where the computers were located, Cpl. Eades presented the Consent To Search Form to the Defendant for his signature after Cpl. Eades had added the word "computer" to the Consent To Search Form so that it was expressly understood that the consent Defendant was providing specifically included the computer. The Maxtor, external hard drive, was actually attached to the

21

computer and before Cpl. Eades disconnected it and seized it he asked the Defendant was it was. The Defendant admitted that he told Cpl. Eades the device was the external storage device he previously had told Cpl. Eades contained the downloaded files.

Other than the Defendant's conclusory statement that he did not consent to the removal of the Maxtor or the forensic search of his computer there was no evidence presented by the Defendant to suggest that he either explicitly or implicitly limited his consent to search to the removal only of the computer tower. The evidence presented established that both the Defendant and Cpl. Eades clearly understood that the point of the search was to determine whether the Defendant's computer contained images of child pornography and that the object of the search included the external storage device attached to the computer, which Defendant admitted contained the images he had downloaded from the internet.

Lastly, the evidence, without contradiction, established that before the Defendant executed the Consent To Search Form - and even before the parties entered the den - the Defendant was provided with a description of how the forensic analysis of the computers would take place. When Defendant executed the Consent To Search Form and orally agreed that the officers could take the computer equipment the evidence established that the Defendant knew and understood exactly what was going to transpire. Accordingly, the Court concludes that the evidence presented by the parties clearly and convincingly supports the conclusion that the Defendant's consent included his consent for officers to remove the computer and attached hard drive from the premises and to conduct an analysis of the computer files to determine whether the computer contained images of child pornography. Therefore, it follows that the removal

of the computer and external hard drive and subsequent forensic analysis of the files on

the hard drive was consensual and there was no illegal seizure in violation of the Fourth

Amendment.

## C.    Staleness

Lastly, Defendant argues that the information possessed by law enforcement

was stale - having been obtained about four months before the encounter with the

Defendant - and therefore the officers lacked probable cause to justify an encounter

with the Defendant. Defendant's argument is without merit for two primary reasons.

First, the search in this case was premised entirely upon consent and not upon a

warrant issued after probable cause had been established. It is well settled that

voluntary consent can obviate the warrant requirement of the Fourth Amendment.[15]

Accordingly, whether or not law enforcement did or did not have probable cause to

obtain a warrant is completely irrelevant for Fourth Amendment purposes.

Secondly, traditional concepts of staleness that might apply to the issuance of

search warrants for contraband or drugs do not mechanically apply to situations, as

here, where the object of the search is for images of child pornography stored on a

computer. When reviewing staleness challenges courts do not apply "some talismanic

rule which establishes arbitrary time limitations for presenting information to a

magistrate, [but] rather [the court] reviews each case based on the unique facts

presented."[16] Therefore in making a case by case determination the Court "may

---

[15] *See,* Schneckloth, 412 U.S. at 227.

[16] United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994).

23

consider the maturity of the information, nature of the suspected crime ... habits of the accused, character of the items sought, and nature and function of the premises sought to be searched."[17] Consequently, "[w]hen a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes.'"[18]

In this case, the information obtained by law enforcement implicating the Defendant in trading in child pornography through peer-to-peer file sharing was obtained by the Internet Crimes Against Children Task Force in March of 2005, which was only four months before the July 19, 2005 consensual search occurred in this case. Because those individuals who possess and trade in child pornography tend to maintain the visual depictions they have downloaded for long periods of time most courts have refused to sustain staleness challenges to search warrants for computer images of child pornography which were executed even later than the gap in this case between the discovery of the facts supporting the search and the execution of the search.[19]

---

[17] *Id.* (Citations omitted)

[18] United States v. Irving, 432 F.3d 401, 416 (2nd Cir. 2005)

[19] *See, e.g.* Irving, 432 F.3d 401 (23 months between most recent information and issuance of warrant); United States v. Ramsburg, 114 Fed. Appx. 78, 82 (4th Cir. 2004)(email image of child pornography obtained more than two years before warrant held not to be too stale); United States v. Chrobak, 289 F.3d 1043 (8th Cir. 2002)(images intercepted three months before warrant not stale); United States v. Roby, 27 Fed. App. 779 (9th Cir. 2001)(eight and one half month gap between downloaded files and warrant not stale); United States v. Hay, 231 F.3d 630, 636 (9th Cir. 2000)(six month time period between transmission of child pornography images and warrant did not render information too stale); United States v. Bateman, 805 F.Supp. 1041 (D.N.H. 1992)( seven month delay); United States v. Lamb, 945 F.Supp. 441 (N.D.N.Y. 1996)(five month delay); United States v. Albert, 195 F.Supp. 2d 267 (D. Mass. 2002)(several months delay); United States v. Sherr, 400 F.Supp. 2d 843 (D. Md. 2005)(eight months delay).

Accordingly, even assuming that the officers required probable cause - which they did not - the four month gap between the date the information was obtained that child pornography had been downloaded to Defendant's computer and the date that the officers went to Defendant's home to investigate did not constitute stale evidence that would be insufficient to support a search of Defendant's computer based upon probable cause. For these reasons, Defendant's challenge to the search on staleness grounds is without merit.

## IV.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that: (1) Defendant William C. Miller's Motion To Suppress Evidence (Warrantless Search-Staleness Of Information In Support of Probable Cause) (Doc. 22), (2) Defendant William C. Miller's Motion To Suppress Evidence (Warrantless Search-Consent To Search Invalid As Involuntary) (Doc. 23), and (3) Defendant William C. Miller's Motion To Suppress Evidence (Warrantless Search-Consent Invalid Due To Scope Of Same Being Exceeded) (Doc. 24) should be **DENIED.**

**IN CHAMBERS** at Ocala, Florida this 6th day of July, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:

Honorable Wm. Terrell Hodges
Senior United States District Judge

United States Attorney (Hawkins)
Counsel for Defendant

25